The 4th District Appellate Court of the State of Illinois has reconvened. The Honorable Catherine E. Zeno presiding. Good evening, everyone. This is 4-25-0243, People of the State of Illinois v. Maya Nodine. Would counsel for the appellant identify yourself, please? For the appellant, Manuela Hernandez from the Office of the State Appellate Defender. Thank you. And counsel for appellee? For the appellee, Courtney O'Connor for the state. Thank you. All right. At this time, Ms. Hernandez, you may begin your argument. Thank you and good morning. May it please the court, counsel. Here we are again. This case returns to this court following three trials and numerous proceedings that have yet to produce a fair trial and a fair result in this case. As I've mentioned to this court before, the facts of this case may be straightforward, but this case is far from simple because this case involves acute mental health crisis that Maya Nodine was suffering at the time of the offense. All the evidence shows that Maya was trying to kill herself, not anyone else, and that she killed the other driver. There's no question about that, but there is no evidence that Maya planned this or that she gave this any thought before it happened. And we know based on a psychiatric report that's in the record, testimony from Dr. Finkenbein that was given at the first trial and testimony from Dr. Finkenbein that was given at this trial during sentencing, that at the time of the crash, Maya was suffering from a major depressive disorder, post-traumatic stress disorder, and was experiencing a panic attack that caused her to lose her ability to make rational choices in that moment. So the only issue in this case was whether or not Maya had the necessary mental state to be guilty of first-degree murder, whether she was consciously aware that she would hurt somebody else. The evidence here says no. Maya testified, and her testimony was uncontradicted, that during the crash she was overwhelmed, she was irrational, she was unable to form a complete thought. She lacked the necessary conscious awareness. And the state implicitly acknowledged this because the state urged the jury to disregard what Maya was actually thinking at the time of the offense. And this is because the state knew that she was not consciously aware in that moment. And the jury's question about when Maya needed to know that her actions could cause the other driver's death is important because it shows us the uncertainty that surrounded this element of the offense. Because she didn't act with the required mental awareness, she could not be found guilty of first-degree murder. And at most, Maya was acting recklessly and not knowingly when she attempted to end her own life. This was a conscious disregard of a substantial risk. And Illinois courts have repeatedly held that even in deadly outcomes such as the one here, reckless conduct, an act can be reckless and it does not constitute first-degree murder. I would ask that this court compare Maya's mental state to, let's say, someone who is a drunk driver and kills another person in an accident. If you ask a drunk driver while they're sober... Well, the difference is one's an accident and the other's an intentional act. That's kind of a basic difference. Well, Your Honor, in order for the act to be intentional under the first-degree murder statute, it has to be directed towards another person. It cannot... Here, yes, Maya intended to kill herself, but there was no intentionality with respect to the other driver. The intentional act is turning your car into another car and driving directly at them at a high rate of speed. You're trying to compare an accident caused by intoxication with an intentional act. I'm trying to tell you that that is not a legitimate comparison. But if you want to keep making it, go ahead. Well, what I would like to point out is that we do consider the driver's ability in that moment to make a specific choice. Actually, it's all of the acts that occur up to that point that we take into account in a reckless homicide. What acts did he perform or not perform? Under what circumstances was he confronted that would cause a reasonable person to believe that there was a likelihood of causing death or great bodily harm? So it's not the thoughts of the driver at the time of the accident. It's everything that took place up to the accident. What you're trying to do is take us right to the point of the accident and say, as long as I say I had no intention of killing anybody but myself, I'm good. Well, well, I would like to say two things about about your comments. So, first, the key word that you use there is reasonable. Would a reasonable person understand that this that she could kill someone else? And what's important here is that her mental state in that moment was not reasonable. And I'm not talking about necessarily a second, a split second before it happened. I'm talking about when she had an argument with her mother, she gets into the car, and that is when her mental state begins to change. And as to the second part of your statement, whether someone could just say, well, I just wanted to kill myself. So, you know, I'm never going to be guilty of first degree murder. There are situations in where someone wants to kill themselves, perhaps has fantasized about killing themselves by driving into onto another car, wrote it down, has had time to think about it. And under those circumstances, yes, that person didn't intend to kill the other driver. But the person had time to think and reason about what the consequences of their actions would be. And here, the state of mind, Maya's state of mind was altered. It was not reasonable. It was not you and me driving. It was not simply, well, there is a logical connection between me wanting to kill myself, committing this act, and what the consequences are to the other driver. And what the mental state did to her in that moment was to not allow her to have that subsequent thought of the other person. And this is specifically, well, she did testify to that, that she did not think about the other driver, which is why I argue that this court should consider reducing this offense to reckless homicide. However, I think it's important that Dr. Finkenbein was not able to testify in this case. So if I may, if I can direct your attention to the defendant's pro se post-trial claim of ineffective assistance of counsel, I just want to clarify a couple of things. Are you arguing that the trial court did not conduct an adequate Krankel preliminary hearing, or are you just arguing that the trial court erred in denying the defendant's claim? I'm not arguing that the court erred in denying the defendant's claim. I'm arguing that the court should have given her an attorney in order to fully argue her claim of ineffective assistance. So the initial inquiry, I find that the court erred in that it found that there was no possible neglect. So I'm not, I mean, I guess the standard, it's kind of interesting when we're talking about Krankel because can the court deny, fully deny the claim based on the evidence that is presented in a Krankel hearing? That is possible. But in this particular case, the evidence that was presented actually showed possible neglect and the court should have given her an attorney. Additionally, the defendant's pro se claim, her pro se, I'll call it her letter, but her claim for all practical purposes to the trial court mentioned a letter that you had sent to the defendant. Is that letter from you to the defendant part of the record on appeal? No. Okay. And in the pro se letter that the defendant drafted to the trial court, did the defendant specifically allege that attorney Langton did not understand the law regarding admissibility of evidence regarding defendants diminished capacity? Did she make that claim specifically about him misunderstanding the law? I don't have that letter in front of me, Your Honor, but whether she wrote it down specifically or not, I think that the question as to whether this was diminished capacity was brought up by defense counsel himself when he was responding to the allegations in her letter. So counsel did discuss the fact that he had read the previous briefs in this case, that he had looked at the case, at the decision, at this court's decision, and also at the oral arguments that were presented. And he discussed his understanding, I guess, of diminished capacity and whether Dr. Finkenbein's testimony would go to that. So he did put his understanding of the law at issue. Are there other questions about that? Why didn't you include the letter? I'm sorry? Why didn't you include the letter in the record? Well, my communications with my client are confidential, Your Honor. But your client has disclosed it. Well, she's disclosed the fact that I asked her to write the letter, but not, I don't see why. She didn't disclose the content of the letter. Not necessarily word for word, but she didn't disclose the intent or content of the letter. Well, this, I mean, I. The answer would be yes, she did, but go ahead. Sure, she did say that I asked her, that I told her that she should write a letter to the court. That is correct. And you told her why? Well, I mean. According to her. Yes, I told her what the fact that Dr. Finkenbein was not called. And in preparing your appeal, you could have said, listen, this could be very relevant to your appeal. Do you mind if we include the letter that I sent you? No, please go ahead. Well, Your Honor, I certainly did not consider the letter that I wrote to her to be relevant to the questions that are presented in this appeal.  Yes, because what I discussed with her in the letter is what I raised in my opening brief. They're just arguments. They're not facts. Are there any other questions? I mean, if not on this. Okay, for me, if I can follow up with Dr. Finkenbein, if he did not want to testify at defendant's trial and attorney LinkedIn believe the evidence, was it admissible based on the specific facts and circumstances of this case? His decision not to call Dr. Finkenbein would have been trial strategy, wouldn't it? It would not, Your Honor, because the reasons why the attorney defense counsel decided not to call Dr. Finkenbein show a misunderstanding of the law. Counsel believed that Dr. Finkenbein's testimony would not be admissible because it would go to a diminished capacity defense. However, the reason why Dr. Finkenbein's testimony was admissible is because it went to rebut the state's showing of mens rea. She was not raising a diminished capacity defense. She was attacking the mens rea element of the offense with the testimony. And it is clear that this evidence is admissible under Valdez and under our own Supreme Court's decision in Greer, which says that even though certain facts may have been relevant to a defense that was that was admissible before a particular defense that was recognized before. Even though we don't recognize that defense anymore, that does not make the information inadmissible. And in fact, it is admissible to rebut the element of mens rea. So counsel had a misunderstanding of the law in that he didn't understand, even though he specifically stated during the sentencing that he was bringing the testimony of Dr. Finkenbein to discuss Maya's mental state at the time of the offense, he somehow seemed to not understand that that was the only issue at trial. So this was not just a fundamental misunderstanding of the law. It was a fatal mistake because without that information, Maya was unable to corroborate her own testimony about the way that she was feeling and her inability to make conscious decisions about somebody else and not just herself in the moment when the accident occurred or when the offense occurred. And so it cannot be strategy if there is a misunderstanding of the law. It's it just simply can't. And he did Dr. Finkenbein was ready, willing and able to testify at trial. Yes. Well, I there's nothing in the record to indicate otherwise.  Well, didn't didn't attorney Lankton advise the defendant that he wasn't willing to testify at trial? Wasn't that part of her own pro se letter that she reiterated that Lankton told her that, but that the Dr. Finkenbein would then testify at sentencing? Well, I, I, as I said, we really don't know from this record other than what your client stated that he wasn't willing to testify at trial. Well, I well, first, I would I would if if that's what the letter states, I'm sorry, I don't have the letter in front of me, so I can't specifically read it. But obviously, I take what you're saying as a fact. So. It's if it's unclear because of the way that the Krankel hearing was conducted and counsel's reasons, whether, in fact, Dr. Finkenbein was unwilling to come to trial and testify. The defense counsel did state during the Krankel hearing that Dr. Finkenbein didn't want to testify with respect to insanity, but insanity was not going to be the defense that was going to be raised based on the arguments that had been made previously. And the arguments that were made on appeal in front of this court. So he didn't want to testify at trial, but was willing to testify at sentence. I mean, that is possible, but I think that if that was the case, it would have been important, given the fact that his testimony was so crucial and was specific to the one of the main, the only contested element at trial. That Maya had an attorney to help her present her claim, this attorney could have talked to Dr. Finkenbein, and maybe this attorney would have confirmed the facts. And in addition to that, even if Dr. Finkenbein did not want to come testify, that was not necessarily his decision. He could have been subpoenaed. He had already testified at trial, and he had already filed a report. So whether or not he wanted to was not really a basis to make a determination when we are talking about the most crucial issue in this trial. So, yes, perhaps Dr. Finkenbein didn't want to, maybe that's what defense counsel told Maya because defense counsel didn't want to bring him in. I don't know. I don't know what their conversations were about necessarily. But I do know that counsel understood that Dr. Finkenbein's testimony was going to go to her mental state and that counsel believed that for some reason. He couldn't bring this evidence in because it could be perceived as diminished capacity, which was a misunderstanding of the law and counsel could have subpoenaed Dr. Finkenbein's testimony. So, yes, perhaps the defense counsel didn't want to bring this evidence in because it could have been perceived as diminished capacity.  Finkenbein's testimony was going to go to her mental state and that counsel could have subpoenaed Dr.  So, yes, perhaps the defense counsel didn't want to bring this evidence in because it could have been perceived as diminished capacity. And the jury had their question. And when we look at this question, wasn't the thrust of the question or the point of the question the time that the defendant had to have known that her actions created or were likely to create a strong probability of death or great bodily harm? So it was the time, not the fact of knowledge itself. Well, Your Honor, I believe that the definition of knowledge, the fact that there needs to be conscious awareness was the answer to the jury's question in that what's important really is what the person knows in that moment. What the person is consciously aware of in the moment that they commit the act. And the definition of knowingly would have made that clear. Now, the jury didn't ask specifically, we would like to have the definition of knowingly. That is true. However, looking at the evidence, looking at what was presented, counsel should have known that the answer to that question was in the jury instruction. It was right there. Yet counsel failed to request that the court present this instruction to the jury. So, yes, it is not very explicit, but it is a question about knowingly because knowingly is about what is in your mind in the moment when you commit the act. And not what you just know. I see that my time is up. But again, I would ask that this court reduce her conviction to reckless homicide or provide the other relief that's requested in the briefs. Thank you. Ms. O'Connor. Thank you. Counsel. The case here all comes down and should be focused on the death of Mrs. And through the evidence provided by the state, they proved beyond a reasonable doubt that defendant knowingly drove her vehicle sped up at ninety one miles per hour and swerved into oncoming headlights, knowing that at least one individual that being joy was inside that vehicle. She crashed into it. That evidence is support that. There is a defendant did testify that she swerved into the headlights when she saw them coming at her prior to the accident. She had a heated conversation with her mother that resulted in a panic attack that resulted in trouble breathing. All information that's common knowledge of what could ensue when you have a panic attack. The evidence provided shows that defendant did not decide to pull over when she had this feeling. She did not decide to, for example, drive into a tree. She not decided to drive into a ditch. She decided to make the intentional decision to drive into another vehicle, knowing there was somebody in that vehicle, that there was a strong probability that she would cause death or great bodily harm to that person. So what evidence is there in the record that she knew someone was in that vehicle? Well, I should say there's reasonable inference that if a vehicle is coming towards you, that somebody is driving that vehicle. There's common knowledge that the vehicle is coming towards you. You see headlights coming towards you on the road. There's going to be somebody in that vehicle that you are going to be crashing into. And how do you respond to opposing counsel's argument that she was not thinking rationally that she suffered from this? She was in crisis mode, was not thinking clearly, rationally as a reasonable human being. How do you respond to that argument? I would respond that it's more towards what her knowledge is going into crashing into another vehicle, not so much as what she thought before. And the knowledge is that if you're driving a vehicle at 91 miles per hour into another vehicle, you have knowledge of the strong probability you're going to cause great bodily harm to the person in that other vehicle, especially going at 91 miles per hour. Does that answer your question, Your Honor? I'm not sure. Let me think about it. Well, the second proposition to the instruction on issues for sustaining a charge of first-degree murder is that when the defendant did so, namely performed the acts which caused the death, when the defendant did so, she knew her acts created a strong probability of death of great bodily harm to Joy Hatton. Right?   She testified on cross-examination that she was aware that that's what could happen. She just wasn't thinking about it at the moment. Correct. She testified on cross-examination that prior to the accident, she knew that driving a vehicle, an oncoming vehicle would cause a strong probability. I think the response was if you'd asked me that before, I would have said yes, but I wasn't thinking of that at the moment. Correct. So she had the knowledge going into the crash that driving her vehicle into oncoming traffic caused a strong probability of great bodily harm or death. That is correct, Your Honor. Relying on that evidence, I would argue that it did prove the defendant guilty of first-degree murder with her driving her vehicle at 91 miles per hour into that of Joy Hatton. If there's any other questions regarding that issue, I will take my time. Otherwise, I will move on to the trial counsel's and effective assistance counsel argument. I don't have any. Thank you. As the defense counsel argued, trial court, they alleged that the trial counsel was ineffective for not calling Dr. Pinkenbein to testify as to defendant's mental state at the time of the incident. Putting the diminished capacity argument aside for a moment, his testimony would not have been admissible even putting the argument aside as he was not with the defendant at the time of her incident or shortly afterwards to even go to testify to what her state of mind was at the time of the offense. Going beyond that, it is the job of the jury to determine the defendant's state of mind at the time of the incident. With all that, the state would argue that his testimony would not have even been admissible if trial counsel even called him to testify. And then going to the state would still argue that the defendant is attempting to use Dr. Pinkenbein to bring forth a diminished capacity defense. Well, they want to call it going against the mens rea and that argument, it's still, it's an under umbrella of, they're still trying to argue that due to defendant's mental condition at the time of offense, she cannot form the requisite state of mind to find her guilty of first degree murder. And that is, goes exactly to what the diminished capacity defense is in Illinois that is not recognized any longer. So, to that, the state would argue that trial counsel is not an effective for making a trial strategy of not calling Dr. Pinkenbein to testify. And the state would argue that going off of that regarding the hearing that the trial court was correct in determining that trial counsel is not an effective for making this decision. As trial counsel testified during the hearing, it was all a matter of trial strategy after the attorney reviewed the entirety of the record, the appellate, the previous appellate case that we were, both counsel and I were involved in and the appellate arguments of that day. After reviewing all that, he made the trial decision, trial strategy not to call Dr. Pinkenbein. And this was proper, considering his testimony goes exactly to the diminished capacity defense that's not recognized in Illinois and also would not have been admissible as his state of mind of the defendant at the time of the offense. It's a job of the truer fact to determine, and it's not outside of their common knowledge to make this determination. And how do you respond to opposing counsel's argument that it is admissible with respect to proving the mens rea? My argument goes exactly to the Hewlett case is that it still is under a disguise. Basically, they're saying it's for going towards mens rea, but in reality, it is still going towards trying to bring forth the diminished capacity defense through the testimony instead of bringing an affirmative defense. So what does the trial court need to do then to decide to make the decision? Well, and more specifically, we're talking about counsel and ineffective assistance of counsel as well. Why shouldn't counsel have been aware of this fact that it could have been used or perhaps a record should have been made that there was some attempt used or made? I'm sorry, I don't think I understand. Call Dr. Finkbein. Are you asking that there should have been a record of why during trial he did not call Dr. Finkbein, Your Honor? No, that he should have made, he should have gone ahead knowing that it was admissible under the law in Illinois. Why should he not have made an effort to call him? I don't think I'm understanding the question. What is exactly admissible? Sorry. Well, you indicated that when I asked the question, how do you respond to opposing counsel's argument with regard to the fact that it's admissible? This type of testimony is admissible for mens rea, not the diminished capacity testimony. Correct. Okay. And your response was? That I would ask the court to follow the analysis in the Hewlett case, the Peel v. Hewlett case that says that it's still, that even though they're arguing that is a mens rea argument, that in reality, the state would argue that it's actually just trying to bring forth a diminished capacity defense through a mens rea argument. So that it's always inadmissible? Is that what it held? I believe in this case it is. When you say in this case, I don't recall specifically, although I looked at Hewlett. That that's what they held. I thought there was some type of balancing. When we look at the Valdez case, when we look at the First District Valdez case, though, counsel, it does distinguish between that type of evidence that might be used to rebut mens rea versus an affirmative defense. And I understand that you are claiming in this context, at least it sounds like, that how it was presented previously or here was, in fact, an affirmative defense. But to Justice Senoff's question, I think the question is, in those instances as Valdez cites, where it may be permissible to rebut mens rea, why wouldn't it in this case with the particular facts of this case? Thank you. Very good question, Your Honor. I'm not entirely sure. Well, let me back up to where this all would have come from. Didn't Langston indicate that he had spoken with Ms. Hernandez personally? Correct. Right. And she's the one advocating the use of this now, correct? Correct. And we can presume she was advocating the use of it at the time that she spoke with Mr. Langston, correct? Correct. And he testified or he told the court that after doing all of that, he didn't believe that diminished capacity was an argument to be had at trial. And that may not be the best way of saying it, but the point was, yeah, I listened to what she had to say, and it wasn't very persuasive to me, and I didn't believe that it was going to be admissible under the circumstances. And lo and behold, we do have the Valdez case, which clearly makes the distinction as to the circumstances under which you can use it and the circumstances under which you can't. And he made the tactical decision that I probably am not going to be pursuing a claim I can't justify with an uncooperative expert witness who does not want to testify at trial, which we call that trial strategy. Correct, Your Honor. And that's what the state is going to, that the counsel was not ineffective from this decision. It's based on the record. It's clearly a matter of trial strategy. And going off that, the defendant cannot prove that counsel was ineffective when it went directly to trial strategy in this case. Counsel, if I can direct your attention to the sentencing hearing, unless Justice DeArmond or Justice Zinoff had other questions on this issue. No, that's exactly where I was going also with the question, so please proceed. I think it's important we address that in the time we have left. Counsel, I would like you to address, it appears to me, you know, the court was discussing the applicable mitigating factors in the case and then went on to say in aggravation, the court looks at and finds that the defendant's conduct caused or threatened serious physical harm to another. And that being Ms. Joy Hatton, and that a sentence is necessary to deter others from committing the same crime. So it appears to me the court only relied on two aggravating factors. One of those is the caused or threatened serious harm. Why is that a proper factor for the court to rely upon and not something that was inherent in the offense? As the state did argue, thank you for your question. As the state did argue in its brief, we would argue that, we made the argument that technically the state did not consider this factor. It did state it in passing, but technically did not say it considered this factor. And to that, the court is allowed to consider the serious nature and circumstances of the offense and the debris of harm that was caused in that conduct by the defendant. But there was no, there was no discussion, no amplification that really would point us to the fact that that's what this court was doing. If we look at cases and other cases where the nature of the offense and the factors you mentioned are discussed, that is not what we have here, is it? It's certainly not how I read it. I understand, Your Honor, but the state is just going to argue that the court never said it considered this as an aggravating factor. It said that… He prefaced his comments by, in aggravation, the court looks at. And then he just mentioned two. Correct. Why isn't that a pretty good indication the court was considering an aggravating factor? The state would argue that it's just more towards comments made in passing regarding the death that occurred in this case and not so much that it considered that death in aggravation in this case. And if this court is going to find it did consider that factor, that there was little to, there's little weight on that factor compared to the actual seriousness of the offense here. And so the court is going to find that they did rely on an improper factor, that such reliance does not require remand in this case when considering seriousness of this offense, the nature and circumstances, the degree of harm behind this offense, and the need to deter others. That would make the 30-year sentence proper and not excessive in this case. Well, the court went a little further than mentioning this in passing because the court stated, I think, at 2331 of the record. So having regard to the nature of circumstances of the offense, the history, character, condition of the defendant, the courts of the opinion and mandated by law that you be sentenced to Illinois Department of Corrections. The court has been given a range of 20 to 60 years, and here's the operative language, weighing the factors. So it's not just a passing, weighing the factors. I have previously mentioned the court comes to the conclusion that a sentence of 30 years in Illinois Department of Corrections is most appropriate. So I'm not sure how this record reflects that it was just in passing. Thank you for your comment, Your Honor. I appreciate it. However, I would still argue that even with that comment, that it does not go to the weight exactly that even if this court considers the factor relied on improperly, that the court did not give it sufficient weight that requires remand in this case. And that based on the 20 to 60 year sentencing range, the sentence was not excessive at 30 years considering the seriousness of this offense. The life that was lost and why that was lost in this offense is great. I think that needs to be at the forefront and that the need to deter others here. The degree of harm here was existential, and we can really consider that in this case. If there's not any more questions, the state would rest on its brief of the remaining arguments and ask that this court affirm the defendant's conviction in this case. All right, Ms. Hernandez, your reply and rebuttal. Thank you. I would like this court to note that what's important in People v. Greyer is not whether evidence is being introduced to disguise some other defense that is no longer recognized in Illinois. What the Greyer decision tells us is that the court must look at the rules of evidence, and that is the question. It's not whether maybe it's diminished capacity or not. Maybe it's voluntary intoxication or not. Is that a defense? Are they trying to sneak something in? That is not the issue. The issue is, under the rules of evidence, is this probative, and is that probative value, is the prejudice beyond the probative value that that evidence has? And so, is the testimony of Dr. Finkenbein admissible in this case? And if we look at the rules of evidence, it is. Now, counsel points to the Hewlett decision in that the court there did mention that the expert wouldn't be admissible because the expert had done this examination of the defendant three years after the fact. I would point out that here, the report was done, the doctor's examination was done only six months after the incident, not three years. And also, if the timing of the expert examination, if the expert was required to be with the person in the moment or very shortly thereafter in order to be able to provide a report about the mental state of the person, we wouldn't be allowed to bring an insanity defense. How is that expert's testimony relevant when the expert is probably interviewing this person a long time after the offense has occurred? And in Valdez, the court specifically said, looking at the rules of evidence, does the defendant have the opportunity to rebut evidence about their mental state? And they do, and the court must look at the rules of evidence. Diminished capacity is irrelevant, and I would like to point to Justice McBride's concurrence, which was cited by the state in their brief, which says, if tailored appropriately and properly introduced under the Illinois rules of evidence, expert testimony may be used to challenge the state's burden of proof. I would find that a defense based on diminished capacity was not raised here. An affirmative defense requires the state to prove beyond a reasonable doubt that the defense does not apply. That is not what we're asking here. We're asking for her to be able to present a defense where her mental state can be corroborated by an expert and understood by the jury. The second point I would like to make about the timing of the knowing. If what knowledge required was knowledge at any moment when we are acting rationally, a drunk driver would be guilty of first degree murder because that drunk driver has the knowledge in their mind that if they crash into another person, they can kill them. And we don't because we understand that in that moment, there is an altered mental state that does not allow this individual to make rational choices and to understand the risks to others. And that is why it's important, why this timing is important. It is important because it has to be in the moment when the person is making the choice, is committing the act. Here, Maya's mental state in that moment was altered. She was not thinking rationally. Therefore, conscious awareness, that key term, is important to determine when the timing of the mens rea has to occur. And so, you know, the first degree murder says you have to have the knowledge at the time. But what is knowledge? Is it knowledge at all times? You know, when we're just in our normal state of mind? No, it says when the defendant did so. It's real simple. It's not complicated. When the defendant did so, that's the time. Right, but the state is arguing that at the time she did have the knowledge because that knowledge is present in her brain, which is true. That's all. I wasn't thinking about it at the moment, but she was clearly aware that if you ran into another car 91 miles an hour head on, it's probably going to be a bad thing. I see that my time is up. And if I could just make one, one comment, and is that it is important, her mental state at the time. That's why Dr. Finkenbein's testimony was so crucial in this case. Could she access the information that she had in her mind in order to make the right choices? If he had been able to testify, he would have said no. And with that, I ask that this court grant the relief that's requested in the briefs. Thank you. Thank you. Any further questions from you, Justice Dearmond? No, thank you. Thank you, counsel. No, thank you, counsel. Thank you, counsel, for your arguments this morning. The court will take the matter under advisement and render a decision in due course. Court is adjourned for the day. Thank you.